

FILED by *SA*

OCT 13 2017

STEPHEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. MIAMI

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, <u>ex rel</u>. ADA DE LA VEGA, | Case No. **17-23762** |
| | **COMPLAINT FOR VIOLATION OF FEDERAL FALSE CLAIMS ACT** |
| Plaintiff, | **CIV - HUCK** |
| vs. | **FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2)** |
| CARECLOUD CORPORATION, ALBERT SANTALO, and KEN COMEE | **JURY TRIAL DEMANDED** |
| Defendants. | **\[McALILEY\]** |

Plaintiff-Relator Ada de la Vega, through her attorneys, on behalf of the United States of America (the "Government" or the "Federal Government"), for her Complaint against defendants CareCloud Corporation, Albert Santalo, and Ken Comee (collectively, "CareCloud" or "Defendants"), alleges based upon personal knowledge, relevant documents, and information and belief, as follows:

## I. INTRODUCTION

1.    This is an action to recover damages and civil penalties on behalf of the United States of America arising from false and/or fraudulent records, statements and claims made and caused to be made by Defendants and/or their agents and employees, in violation of the federal False Claims Act, 31 U.S.C. §§ 3729 et seq. ("the FCA").

2.    This action alleges that CareCloud caused millions of dollars in false claims to be submitted to the Department of Health and Human Services (HHS) for federal incentive payments through the Electronic Health Record (EHR) Incentive Programs.

3.    Pursuant to the Health Information Technology for Economic and Clinical Health Act (HITECH Act), HHS established the Medicare and Medicaid EHR Incentive

{00076331; 3 }                                          1

Programs (also known as the "Meaningful Use program"), which provided incentive payments to healthcare providers who demonstrated "meaningful use" of certified EHR technology.

4.      CareCloud developed and sold EHR software to healthcare providers throughout the United States.  To ensure that its customers received incentive payments, CareCloud: (a) falsely represented to its customers that its software complied with the requirements for certification and for the payment of incentives under the Meaningful Use program. (b) caused its users to falsely attest to meeting the requirements for payment of incentives, when CareCloud's software could not support the applicable requirements in the field; and (c) caused its users to report inaccurate information regarding Meaningful Use objectives and measures in attestations to the Centers for Medicare & Medicaid Services (CMS).

5.      Flaws in CareCloud's EHR not only rendered the system unreliable and unable to meet Meaningful Use standards, but the flaws also created a risk to patient health and safety. Rather than spend the time and resources necessary to remedy the flaws, or even to alert customers to the problems, CareCloud management -- led initially by Defendant Santalo and then later by Defendant Comee -- focused instead on the development of new products and new sources of revenue.

6.      Since 2014, healthcare providers who used CareCloud's software and attested to satisfying the Meaningful Use objectives and measures received incentive payments through the Meaningful Use program. Had CareCloud disclosed that its software did not meet the certification criteria, it would not have been certified and its customers would not have been eligible for incentive payments.

7.      In addition, flaws in CareCloud's software caused customers who participated in the Medicare program to submit false and inaccurate reports to CMS under the Physician

Quality Reporting System (PQRS), which resulted in the customers receiving higher reimbursement payments from Medicare than they were entitled to receive.

8.     Finally, this Complaint alleges that CareCloud provided remuneration to certain individuals to recommend its products to prospective customers in violation of the Anti-Kickback Statute. Requests to the Federal Government for incentive payments that resulted from unlawful kickbacks constituted false claims.

9.     CareCloud's false and fraudulent statements and conduct alleged in this Complaint violate the federal False Claims Act (FCA), 31 U.S.C. §§ 3729 et seq. The FCA allows any person having information about an FCA violation (referred to as a qui tam plaintiff or "relator") to bring an action on behalf of the Government, and to share in any recovery. The FCA requires that the complaint be filed under seal for a minimum of 60 days (without service on the defendant during that time) to allow the Government time to conduct its own investigation and to determine whether to join the suit.

10.    Qui tam plaintiff Ada de la Vega seeks through this action to recover all available damages, civil penalties, and other relief for the FCA violations alleged herein in every jurisdiction to which Defendants misconduct has extended.

## II.   **PARTIES**

11.    Plaintiff United States of America is the real party in interest herein. The United States, acting through HHS, administers the Medicare program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395kkk-1 (Medicare), and administers grants to states for Medical Assistance Programs pursuant to Title XIX of the Social Security Act, 42 U.S.C. §§ 1396, et seq. (Medicaid). The United States, acting through HHS, also administers the Meaningful Use program and a certification program for EHR technology.

12.     *Qui tam* plaintiff/relator Ada de la Vega ("Relator") is a resident of Pembroke Pines, Florida.  She started working at CareCloud on July 7, 2014 as Manager in the Support Department.  On September 14, 2015, she was promoted to Senior Manager of the Support Department.  In that position she manages the team that handles support requests from medical offices that use CareCloud's EHR.  Relator has worked in the healthcare industry for 15 years.  Relator brings this action on behalf of the United States of America, the real party in interest.

13.     Defendant CareCloud Corporation is a privately-held Delaware corporation with headquarters in Miami, Florida.  CareCloud was founded in 2009 by defendant Albert Santalo.  CareCloud and its affiliated companies manufacture and sell cloud-based healthcare IT solutions including electronic health record, practice management, and revenue cycle management software.  CareCloud's principal EHR product is called "Charts."

14.     Defendant Albert Santalo is the Founder and former Chairman of the Board and CEO of CareCloud.  He founded the company in 2009.  Mr. Santalo was replaced as CEO in April 2015 by defendant Ken Comee.  Thereafter Mr. Santalo remained at the company as Chairman of the Board and Chief Strategy Officer until early 2016, when he was removed from those positions for reasons not disclosed by the company.

15.     Defendant Ken Comee is Chief Executive Officer and Director of CareCloud.  He has been a member of the Board of Directors since 2012 and became the CEO in 2015.  Prior to taking the CEO position, he ran software companies for a number of investors in Silicon Valley, including Norwest Venture Partners, CareCloud's largest investor.

## III.     JURISDICTION AND VENUE

16.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this

Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.  Although the issue is no longer jurisdictional after the 2009 amendments to the FCA, to Relator's knowledge there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint, as those concepts are used in 31 U.S.C. § 3730(e), as amended by Pub. L. No. 111-148, § 10104(j)(2), 124 Stat. 119, 901-02.

17.   Moreover, whether or not such a disclosure has occurred, Relator would qualify as an "original source" of the information on which the allegations or transactions in this Complaint are based.  Before filing this action, Relator voluntarily disclosed to the Government the information on which the allegations or transactions in this Complaint are based. Additionally, Relator has direct and independent knowledge about the misconduct alleged herein and that knowledge is independent of and materially adds to any publicly disclosed allegations or transactions relevant to her claims.

18.   This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) because that section authorizes nationwide service of process and because the Defendants have minimum contacts with the United States.  Moreover, the Defendants can be found in and/or transact business in this Judicial District.

19.   Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)-(c) and 31 U.S.C. § 3732(a) because the Defendants can be found in and/or transact business in this District, and because violations of 31 U.S.C. §§ 3729 *et seq.* alleged herein occurred within this District. At all times relevant to this Complaint, Defendants regularly conducted business within this District.

IV.    **STATUTORY AND REGULATORY BACKGROUND**

    **A. The False Claims Act**

20.    The FCA imposes civil liability on any person who, *inter alia:* (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government a false or fraudulent claim for payment or approval; (2) knowingly makes, uses or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the Government; (3) knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government; or (4) conspires to violate the FCA. 31 U.S.C. §§ 3729(a)(1)(A), (B). (C), and (G).

21.    The FCA defines a "claim" to include "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property that - (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest . . . ." *Id.* at § 3729(b)(2).

22.    The FCA defines the terms "knowing" and "knowingly" to mean "that a person, with respect to information - (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information. *Id.* at § 3729(b)(1)(A). The FCA does not require proof of specific intent to defraud. *Id.* at § 3729(b)(1)(B).

23.    The FCA provides that the term "material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Id.* at § 3729(b)(4).

24.     Any person who violates the FCA is liable for a mandatory civil penalty for each such claim, plus three times the damages sustained by the Government. *Id.* at § 3729(a)(1).

**B.     The Anti-Kickback Statute**

25.     The federal Anti-Kickback Statute (AKS), 42 U.S.C. § 1320a-7b(b), provides, in pertinent part:

> (2)     Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person -
>
>> (A)     To refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>> (B)     To purchase, lease, order or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,
>
> Shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

26.     Accordingly, manufacturers of products paid for in whole or in part by federal healthcare programs may not offer or pay any remuneration, in cash or in kind, directly or indirectly, to induce physicians, medical practices, or others to order or recommend products paid for in whole or in part by Federal healthcare programs such as Medicare and Medicaid.

27.     The Patient Protection and Affordable Care Act (PPACA), Publ. L No. 111-48, 124 Stat. 119 (2010), provides that violations of the AKS are *per se* violations of the FCA: "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for the purposes of [the False Claims Act]."

28.     The PPACA also clarified the intent requirement of the Anti-Kickback Statute, and provides that "a person need not have actual knowledge of this section or specific intent to

commit a violation" of the AKS in order to be found guilty of a "willful violation." *Id.*

**C.      Certified EHR Technology and the Meaningful Use Program**

29.      On February 17, 2009, the HITECH Act was enacted to promote the adoption and meaningful use of certified EHR technology. Under the HITECH Act, the HHS Office of the National Coordinator for Health Information Technology (ONC) established a certification program for EHR technology. As part of the certification program, EHR vendors attest to ONC authorized certification bodies (ACB) and accredited testing laboratories (ATL) that their software meets the certification requirements established by ONC. The certification bodies and testing laboratories test and certify that vendors' EHRs are compliant with the certification requirements.

30.      Through the Meaningful Use program CMS makes incentive payments to healthcare providers for demonstrating meaningful use of certified EHR technology. Individual practitioners (known as Eligible Professionals or EPs) could qualify for up to $43,720 over five years from Medicare (ending after 2016) and up to $63,750 over six years from Medicaid (ending after 2021).

31.      In order to qualify for incentive payments under the Meaningful Use program, Eligible Professionals were required, among other things, to: (1) use an EHR system that qualified as certified EHR technology; and (2) satisfy certain objectives and measures relating to their meaningful use of the certified EHR technology.

32.      HHS implemented the certification criteria and incentive payment requirements in multiple stages. On January 13, 2010, HHS published in the Federal Register interim final rules setting forth the "2011 Edition" certification criteria and a proposed rule setting forth the "Stage 1" requirements for incentive payments. HHS

finalized these rulemakings by publication in the Federal Register on July 28, 2010. In Stage 1, an Eligible Professional's use of certified EHR technology generally needed to satisfy fifteen "core objectives" and five out of ten "menu set objectives."

33.    On September 4, 2012, HHS published in the Federal Register the final rules setting forth the "2014 Edition" certification criteria and "Stage 2" requirements for incentive payments. In Stage 2, an Eligible Professional's use of certified EHR technology generally needed to satisfy seventeen "core objectives" and three out of six "menu set objectives."

34.    On October 16, 2015, CMS published in the Federal Register a final rule with comment period setting forth the "Modified Stage 2" requirements for incentive payments. For years 2015 through 2017, Modified Stage 2 eliminated the concept of "menu set objectives" and required all Eligible Professionals to attest to a single set of objectives and measures.

35.    In October 2015, CMS also released a final rule that established Stage 3 in 2017 and beyond, which focuses on using certified EHR technology to improve quality, safety and efficacy of health care, including promoting patient access to self-management tools and improving population health.

36.    Starting in 2015, all providers were required to use technology certified to the 2014 Edition. For 2016 and 2017, providers can choose to use technology certified to the 2014 Edition or the 2015 Edition.

37.    To qualify for incentive payments in each Stage of the Meaningful Use program, healthcare providers are required each year to attest that they used certified EHR technology and satisfied the applicable Meaningful Use objectives and measures. Use of

certified EHR technology and satisfaction of applicable Meaningful Use objectives and measures are material to payment under the Meaningful Use program.

38.     To obtain certification, EHR vendors must attest to an ACB that their EHR product satisfies the applicable certification criteria, submit to certification testing by an ATL, and pass such testing.

39.     Certification testing is based on the certification criteria the vendor represents its software satisfies and on which it requests to be tested and certified. The certification and testing bodies use standardized testing protocols ("test scripts"), which identify each step the vendor will be required to take during testing. The test scripts are available to vendors in advance of their testing date. These scripts are intended to test representative aspects of the criteria under examination and are not intended to test all aspects of the criteria. The certification body relies on the accuracy and good faith of the vendor's attestations to the certification body with regard to aspects of the criteria that are not directly tested.

40.     After obtaining certification, an EHR vendor must maintain that certification by complying with all applicable conditions and requirements of the certification program. Among other things, the EHR product must be able to accurately, reliably, and safely perform its certified capabilities while in use in doctors' offices. EHR vendors must cooperate with the processes established by ONC for testing, certifying, and conducting ongoing surveillance and review of certified EHR technology.

41.     The CMS rules governing the Meaningful Use program recognize that healthcare providers rely on certification for assurance that an EHR product meets the applicable certification criteria, including that it possesses the certified capabilities that

healthcare providers will need to use to achieve relevant objectives and measures, and that the software will perform in accordance with applicable certified capabilities.

42.   Starting in 2017, the Medicare EHR Incentive Program was incorporated into the Merit-based Incentive Payment System (MIPS) under the Quality Payment Program created by the Medicare Access and CHIP Reauthorization Act (MACRA), 42 U.S.C. 1395ee. MIPS is discussed further in ¶¶ 48-51 below.

**D.   Certified EHR Technology and the PQRS Program**

43.   The Physician Quality Reporting System (PQRS) is a voluntary reporting program that provides a financial incentive for health care professionals who participate in Medicare to submit data to CMS on specified quality measures for covered Physician Fee Schedule services furnished to Medicare Part B Fee-for-Service beneficiaries.

44.   For reporting years 2012 through 2014, CMS provided physicians who satisfactorily reported data on the required quality measures an incentive payment of 0.5% of their total allowed charges for the reporting year. Starting in 2015, the program applied a negative payment adjustment to practices with Eligible Professionals that do *not* satisfactorily report data on quality measures. The penalty was 1.5% for 2015 and increased to 2.0% for 2016 and subsequent years. Those who report satisfactorily for the 2016 program year avoid the 2018 PQRS negative payment adjustment.

45.   Providers can participate in PQRS either with or without an EHR. Those who have an EHR can report PQRS data directly through their EHR.

46.   The measures for PQRS are divided into two groups: Individual Measures and Measures Groups. An eligible professional may choose to report any combination of Individual Measures or choose a specific Measures Group. Measures Groups include a minimum of 6

individual measures and normally a maximum of 11 measures. The individual measures in the Measures Groups all relate to a specific diagnosis or problem such as diabetes, coronary heart disease, or others. Also, beginning in 2016, Eligible Professionals must include one cross-cutting measure.

47.     The last program year for PQRS was 2016. Starting in the 2017 program year, PQRS became part of the Merit-based Incentive Payment System (MIPS) under the Quality Payment Program. See ¶¶ 48-51 below.

**E.     The Merit-based Incentive Payment System ("MIPS")**

48.     The Medicare Access and CHIP Reauthorization Act of 2015 (MACRA) created the Quality Payment Program to replace three programs that ended with the 2016 reporting period: the Medicare EHR Incentive Program; the PQRS program; and the Value-Based Modifier program.

49.     The Quality Payment Program has two tracks: the Merit-based Incentive Payment System (MIPS) and the Advanced Alternative Payment Models (APMs).

50.     MIPS payment adjustments are applied to Medicare Part B payments two years after the performance year, with 2019 being the payment adjustment year for the 2017 performance year.

51.     Although as of the date of preparation of this Complaint, MIPS payment adjustments have not yet been made under the Quality Payment Program, Relator alleges based on information and belief that the practices described herein that cause false claims to be submitted to the Government under the Meaningful Use program will cause false claims to be submitted to the Government under the Quality Payment Program.

## V.   ALLEGATIONS

### A.   Background on CareCloud and its Management

52.     CareCloud was founded in 2009 by defendant Albert Santalo, a businessman and serial entrepreneur.  Santalo developed CareCloud on the model of many other hi-tech start-ups, emphasizing a fast-paced environment and "fun" office perks (like ping pong, team building events, and company-wide parties), consistently showing positive revenue growth, and raising as much investor money as possible.  While he was at the helm of CareCloud the company reported revenue growth for 18 consecutive quarters, expanded to Boston, and raised $55 million in venture capital funding from firms such as Intel Capital, Norwest Venture Partners, Tenaya Capital and Adams Street Partners.

53.     Beginning in 2015, Ken Comee became the CEO of CareCloud.  In media reports at the time, Mr. Comee described himself as "a Silicon Valley tech guy."  Prior to joining CareCloud, he ran software companies for a number of investors in Silicon Valley, including Norwest Venture Partners, CareCloud's largest investor. Like Mr. Santalo, Mr. Comee managed the company with a focus on generating positive revenue growth, often at the expense of fixing fundamental deficiencies in the company's core EHR product, "Charts".

54.     While working for CareCloud, Relator witnessed how the company's focus on generating positive revenue growth skewed the company's priorities.  Rather than prioritizing making needed improvements to Charts, CareCloud focused instead on developing new add-ons and new sources of revenue.  For example, much of the energy of the company over the last year has been on developing a flashy new patient payment processing software, called "Breeze," and not on fixing known problems in the EHR software.  Likewise, the company spends a great deal of money on public relations and promoting its image as an industry leader instead of using these

resources to correct fundamental deficiencies in the software.

55.    Employees that have challenged prioritizing profits over quality and that have made a diligent effort to shift the company's focus to patient safety and patient care have been shown the door, because they stopped following orders without questioning.

56.    Despite raising millions of dollars, CareCloud has not fixed core deficiencies in Charts. As explained more fully below, critical bugs have persisted for years and remain unsolved. Based on Relator's experience working in the Support Department, these deficiencies not only render the software unreliable and poorly functioning, but the deficiencies also adversely impact patient care quality and patient safety.

57.    Not surprisingly, the experience of CareCloud's client base is decidedly negative. In a 2017 company-wide survey of customer satisfaction (called the "Net Promoter Score"), negative comments far outnumbered positive comments. Out of a total of 1,539 comments, 645 were negative, 459 were positive, and the remainder were somewhere in the middle.

**B.    CareCloud's EHR Product Passed 2014 Edition Certification Testing Without Fully Implementing All of the Technological Requirements For Certification, and CareCloud Significantly Revised The Product Post-Certification Without Submitting it for Recertification**

58.    CareCloud's EHR product, Charts, is a cloud-based system sold as a complete EHR. Charts was created to be a one-size-fits-all platform that can be molded to a provider's specific needs regardless of specialty or facility type. Charts is used in small practices, in large medical groups, and in specialties such as Cardiology, Ophthalmology, Internal Medicine, Gastroenterology, Orthopedic Surgery, Neurology, Pulmonology, Urology, and Family Practice. CareCloud states on its website that its software is used by "[m]ore than 23,000 medical professionals with 14.3 million patients" in 48 states.

59.    Since the start of the Meaningful Use program, eligibility for incentive

payments required Eligible Professionals to use certified EHR technology. An EHR product cannot be certified unless all applicable certification criteria and standards have been met. Certification is material to payment under the Meaningful Use program.

60.     Certification testing does not confirm that each criteria and standard is satisfied in full and under every conceivable scenario. Rather, testing takes a snapshot of a product's capabilities by ensuring it can pass certain pre-disclosed test cases.

61.     For certification of CareCloud's EHR software, Drummond Group ("Drummond") acted as both the Office of the National Coordinator-Authorized Testing Laboratory (ONC-ATL) and the Office of the National Coordinator-Authorized Certification Body (ONC-ACB), placing it in charge of both testing and certification of Charts.

62.     Based on certification documents, Relator is informed and believes that testing for Version 2.1 took place on November 20-21 and December 13, 2013; testing for Version 2.1.1 took place on November 20-21 and December 13, 2013, and July 9 and August 28, 2014.

63.     As a predicate to obtaining certification for these versions of Charts, CareCloud would have submitted an Attestation form or forms to Drummond representing that CareCloud's EHR software satisfied the 2014 Edition certification criteria and that its software was capable of performing those criteria and standards in the field.

64.     Based upon CareCloud's attestations, and the testing by Drummond, Charts version 2.1 achieved 2014 Edition certification on December 19, 2013, and Charts version 2.1.1 achieved 2014 Edition certification on October 23, 2014.

65.     As explained more fully below, Relator alleges that:

(a) CareCloud passed 2014 Edition certification testing for versions 2.1 and 2.1.1 without fully implementing all of the technological requirements for 2014 Edition

certification. CareCloud did not seek to ensure that the standards, implementation specifications, and criteria were truly met.

(b) CareCloud's version 2.1 and 2.1.1 software did not satisfy the Meaningful Use certification criteria and could not operate in the field in compliance with the requisite certification criteria.

(c) CareCloud failed to adequately review its bugs or service tickets to analyze whether or not software issues impacted the software's ability to meet the standards, implementation specifications, and certification criteria and perform in a reliable manner consistent with its certification.

66.     Relator was not involved in the certification testing or certification process for Charts version 2.1 or version 2.1.1. However, based on the inability of these versions *post*-certification to meet MU requirements, Relator alleges upon information and belief that CareCloud misled Drummond, either through misrepresentations in CareCloud's attestations or through misconduct during the testing, to pass the certification testing and achieve certification for these versions of the software.

67.     The fact that CareCloud improperly obtained certification is evidenced by numerous post-certification bugs and problems in the software in operation that rendered the software unable to meet the requisite certification criteria. Numerous examples of the software's failure to meet certification criteria are provided below.

68.     Relator is informed and believes that CareCloud deceived the certifying body by not submitting new versions of Charts for recertification, as it was required to do. During its history, CareCloud has sold two certified versions of Charts, version 2.1 and 2.1.1. During Relator's tenure with CareCloud, however, the company significantly revised these versions of

the software two times and sold the new versions to customers without calling them new versions and without submitting them for recertification.

69.     For example, after the certification of version 2.1.1 in November 2014, the company made major changes to its software to try to improve its functionality. Internally the company referred to this new version as Charts II, but continued to sell it as version 2.1.1. In 2017, the company revised the software once again, and internally called the new version EHRP, but continued to sell it as version 2.1.1. These changes to the software were more than mere updates that fixed bugs or features that were not working. These changes involved significant revisions and modifications to the software, and had significant impact on its functionality. The changes were so significant that CareCloud had to provide training to providers about the changes.

70.     According to ONC requirements, if a developer modifies its EHR software in a manner that potentially affects the software's capabilities with regard to certification criteria, the developer must submit an attestation to the ONC-ACB attesting that its newer version has not adversely affected the EHR's capabilities for which certification criteria have been adopted. See "Establishment of the Permanent Certification Program for Health Information Technology," 76 FR 1261, 1306 (HHS/ONC Final Rule, January 7, 2011). Thereafter the ONC-ACB may grant certified status to the newer version of the EHR only if it determines that the capabilities for which certification criteria have been adopted have not been adversely affected. See id.

71.     CareCloud bypassed this process entirely and simply sold its newer versions of the software without labeling them as newer versions or notifying the certifying body of the changes. This constitutes a fraud on the certifying body and renders the products effectively uncertified.

### C.  CareCloud's EHR Failed to Satisfy Required Certification Criteria

72.    During the time period relevant to this complaint, CareCloud released software that failed to satisfy required certification criteria and overly relied on customers to identify bugs and other problems.  Some bugs and problems -- even some identified as critical -- persisted on CareCloud's bug list for months and even years.

73.    Representative examples of the deficiencies in Charts related to Meaningful Use criteria are provided below.

### 1.  CareCloud's EHR Routinely Misplaced Laboratory Orders and Laboratory Results

74.    To be certified as a Complete EHR under the 2014 Edition certification criteria, a vendor's software must provide computerized provider order entry, which requires users to be able to electronically order and record laboratory and radiology/imaging orders. This functionality must perform accurately, reliably, and safely to meet the certification requirement.  In many circumstances, CareCloud's software failed to meet this functionality.

75.    The Support Team under Relator opened many service tickets on this issue based on complaints and inquiries received from clients.

76.    One of the most persistent problems involved Lab results being placed in the wrong patient's record.  A few representative examples are:

- Case No. 00204423, opened 4/14/17 ("Lab Results Linked to the incorrect patient");
- Case No. 00173385, opened 10/27/16 ("Lab associated to wrong patient");
- Case No: 204423, opened 4/14/17 ("Labs incorrectly associated to patient");
- Case No. 173385, opened 10/27/16 ("Lab associated to wrong patient").

77.    This problem occurred for several years.  Relator raised the problem with management on multiple occasions with no success.  Only after much proding did Relator finally

persuade the company, in August 2017, to implement a solution that addressed the cause of the problem. Nevertheless, even at that time the company did not come up with a way to remove all of the Lab reports that were sitting in the wrong patients' records.

78.    In August 2017, Relator compiled a list of over 30 cases in which Lab results went into the wrong patient's record.  Relator and her Support Department submitted this list to company management and requested on behalf of the affected practices that CareCloud either (1) remove the Lab reports from the incorrect patient's record  or (2) produce a workflow that would allow the users themselves to remove the Lab reports from the incorrect patient's record.. However, neither solution has been implemented as of the date of preparation of this Complaint.

79.    Not only did this problem render Charts non-compliant with Meaningful Use requirements, it presented a distinct risk of patient harm due to the possibility of treatment decisions being based on the mixed-up records. In addition, the problem caused HIPAA violations because of the unauthorized disclosure of confidential patient information to the wrong patients (in whose chart the Lab report is misplaced) via the patient portal.

80.    Relator is informed and believes that CareCloud was not transparent about this problem with its client base, as evidenced by the list of escalations from the client base frustrated by the problem.

81.    In addition to mixing up Lab reports, there are many other related problems reported by clients, including Lab orders not received by the laboratory (e.g., Case Nos. 142893, 00227209, 00227183, 00227253, and 00227669); and missing lab results (e.g., Case No. 128371).

### 2.    CareCloud's Software Failed to Keep a Complete and Accurate Record of the Clinical Encounter

82.    A "clinical encounter," also known as a "patient encounter," is a physical

encounter in which the Eligible Professional (EP) renders a service to the patient. Documenting the clinical encounter accurately is the cornerstone of any reliable EHR that purports to meet Meaningful Use standards.

83.   CareCloud's EHR, Charts, does not consistently keep an accurate record of the clinical encounter. One persistent problem is that the patient's vital signs (e.g., height, weight, and blood pressure), even though measured and documented by the provider, do not show up in the clinical encounter. Recording vital signs is a required Core Measure for Meaningful Use Stage 2 and important to diagnosis and treatment of the patient.

84.   This problem, which CareCloud internally labels a "defect," was introduced with the most recent version of Charts, which Charts internally calls "EHRP," but sells to customers as "version 2.1.1." The Support Team under Relator opened many service tickets on this issue based on complaints and inquiries received from clients.

85.   As recently as July 31, 2017, an internal company spreadsheet noted that 17 clients were reporting the same problem, described in the spreadsheet as "Vitals not showing on printed notes. Vitals not pulling over to the note (17 clients reporting)." Another spreadsheet showed that in July and August 2017, the Support Department opened tickets for 18 customers with the same complaint about vitals not displaying in the clinical encounter note.

86.   A related problem is that some of the clinical encounter notes show a different provider of record than the provider who signed the note. See, e.g., Case. No. 208726, opened 5/10/17 ("Simple Encounters Showing Different Provider of Record than the Provider who Signed the Note"); Case. No. 207447, opened 5/2/17 ("Patient activity reflecting incorrect provider under provider column").

3.    **The e-Prescribing Functionality of CareCloud's EHR is Flawed and Unreliable and Does Not Meet MU Requirements**

87.    Meaningful Use Stage 2 criteria require healthcare providers to use certified EHR technology to generate and transmit prescriptions electronically (commonly referred to as e-Prescriptions). CareCloud's software was riddled with problems that rendered it non-compliant with this requirement. These problems persist to the present time, several years after certification.

88.    The Support Team under Relator opened many service tickets on this issue based on complaints and inquiries received from clients. Examples of the persistent problems with Charts' e-Prescribing functionality include the following:

89.    <u>Inaccurately recording the quantify or dosage of the medication prescribed</u>. See, e.g., Case No, 0020095, opened 3/28/17 ("Incorrect quantitiy [sic.] on rx"); Case No. 216239, opened 6/23/17 ("E-prescription Refill Showing Different Dispense Amount than Approved Dispense"); Case No. 00217033, opened 6/29/17 ("E-prescription Refill Showing Different Dispense Amount than Approved Dispense"); Case No. 00169236, opened 10/15/16 ("Pharmacy Receiving incorrect Quantity for Medications"); Case No. 00171873, opened 10/19/16 ("Medication Dosage Displaying in Mg Instead of Tablets"); Case No. 00169236, opened 10/5/16 ("Pharmacy Receiving incorrect Quantity for Medications"); Case No. 00183500, opened 12/28/16 ("Error when e-prescribing AmLODIPine 5 mg Oral tablet"); Case No. 00228616, opened 9/13/17 ("Incorrect Prescription Quantity Populating in Simple Encounter Sumamry [sic.]"); Case No. 228401, (software used "ml" for Albuterol Sulfate, even though it is prescribed by number of vials not "ml"); Case No. 229494, (provider prescribed 30 "cap" (i.e., capsules) of Cymbatta, but eRx shows it as 30 "mg"); Case No. 229492 (software selected a different quantity than the provider prescribed); Case No. 00607302, opened 9/21/17 (software

sent Rx for Victoza in "mg" even though physician wrote the prescription in "ml" causing

confusion to the patients; Surescripts reported this to CareCloud and called it a "POTENTIAL

PATIENT SAFETY ISSUE" [all capitals in original]); Case No. 00169236, opened 10/15/16

("Pharmacy Receiving incorrect Quantity for Medications"); Case No. 158721, opened 8/11/16

("Problem with dosage calculations on medications," three related cases); Case No. 00202750,

opened 4/6/17 ("Epinephrine Rx dose & qty confusion").

      90.   Wrong provider listed as the prescribing physician on the eRx.  See, e.g., Case

No. 00210544, opened 5/22/17 ("Wrong provider listed as prescribing physician for

medication"); Case No.21054, opened 5/22/17, ("Wrong provider listed as prescribing physician

for medication").

      91.   Wrong date on the prescription.  See, e.g., Case No. 00220173, opened 7/18/17

("Prescription date of medication changed on Signed note"); Case No. 00202150, opened 4/4/17

("Electronic Prescriptions Sending with Incorrect Date").

      92.   Rx verification not received by pharmacy.  See, e.g., Case No. 00227712, opened

9/5/17 ("Perscription [sic.] refill request response not received by pharmacy").

      93.   General non-functioning of the e-Prescribing Functionality.  See, e.g., Case No.

00227166, opened 8/31/17 ("E-Prescribe setup not working").

      94.   Non-clinical personnel able to order a refill. There is a flaw in the EHR system

that allowed non-physicians and non-clinical person to execute refills.

      95.   There are a multitude of other assorted problems with e-prescribing functionality.

For example, in August 2017, one CareCloud client physician e-prescribing narcotic drugs

experienced time outs of the prescriptions 37 times in just the first three weeks of August.  The

ones that timed out bore the status "Pending Delivery Confirmation."  Since the doctor did not

know if the prescriptions had gone through successfully, she advised that she resubmitted the prescriptions. This would have caused unintended duplicate prescriptions had the doctor not wisely called the pharmacy to double check what was happening and cancel the duplicate prescriptions.

### 4. CareCloud's EHR System Failed Reliably to Document and Track Medications Administered to Patients

96.     Another significant defect in CareCloud's EHR system is its inability to reliably document and track medications administered to patients. The Support Team under Relator opened many service tickets on this issue based on complaints and inquiries received from clients. For example:

- Case No. 00221744, opened 7/28/17 ("Medications prescribed yesterday not showing on medication list for patient");

- Case No. 00220985, opened 7/24/17 ("Inactive Medication showing active within Medication Widget");

- Case No. 00203622, opened 4/11/17 ("Medication in Summary Tab Duplicated when edits are made");

- Case no. 00200075, opened 3/2/17 ("Medication Missing from Patient Med List-Charts");

- Case no. 00172460, opened 10/24/16 ("Medication prescribed on 9/26/16 not displaying under Medications list");

- No. 14706, opened 6/4/16 ("Prescribed Medication Not Shown in Medication List in Summary");

- No. 00172460, opened 10/24/16 ("Medication prescribed on 9/26/16 not displaying under Medications list");

- Case 211551, opened 5/30/17, ("Medication Refill Requests Approved and Received by Pharmacies but Not Reflecting as Prescribed in the System");

- Customer satisfaction survey response, 7/24/17 ("Persistent problems with how EMR captures/displays data (eg. historical medications are listed as "prescribed" on the date they are entered), etc.").

97.     The software's failure to reliably record medications can lead to serious patient harm, because the system will not identify potential hazards associated with the medication, such as risk factors for a diagnosis or contraindications for other prescriptions.

### 5. CareCloud's EHR Caused Large Claims Leakage, Which Rendered Various CQM and PQRS Measurements Unreliable

98.     Clinical Quality Measures (CQMs) are measurements that track the quality of health care services provided by Eligible Professionals. Since 2014, all Medicare-eligible providers beyond their first year of demonstrating meaningful use are required to electronically report their CQM data to CMS using certified EHR technology in order to be able to receive an EHR incentive payment.  Providers scheduled to demonstrate Stage 1 or Stage 2 are required to report on 9 of the 64 approved CQMs.  Additionally, all providers must select CQMs from at least three of the six key healthcare policy domains recommended by the Department of Health and Human Services' National Quality Strategy.  The six domains are: Patient and Family Engagement; Patient Safety; Care Coordination; Population and Public Health; Efficient Use of Healthcare Resources; and Clinical Processes/Effectiveness.

99.     Massive "claims leakage" has been a huge problem for CareCloud's EHR for as long as Relator has been with the company.  "Claims leakage" refers to claims that the provider believes have been submitted to the insurer through the EHR in the ordinary course of business but that in fact have not been submitted – these claims are inexplicably dropped out of the

system with no notification to the provider.  (On some occasions, all charges within a claim drop out of the system; on other occasions, some but not all charges drop out of the system, and the claim will submit with partial missing charges.)  The financial impact falls on the providers who lose reimbursement revenue.

100.    Claim leakage may also affect Meaningful Use and PQRS reporting because a number of MU and PQRS measurements are based on claims data and, therefore, incomplete submission of claims may skew it's a provider's calculation of data needed for CQM and PQRS measures.

101.    Claims leakage is not the only problem that renders the calculation of CQM and PQRS measures unreliable in Charts. Assorted other problems also exist.  See, e.g., Case No. 00188175, opened 3/21/17 ("2014 CQM Report not reporting correctly"); Case No. 00034040, opened 1/27/15 ("2014 CQM List Needs Findings Updated for CQM CMS50 - current findings are not associated with the correct SNOMED codes"); Case No. 197462, opened 3/8/17 ("PQRS report not reflecting accurately . . .").

### 6.  Date/Time Stamp Problems

102.    A recurring problem for CareCloud's EHR is that it assigns incorrect times or dates to office visits, appointments, or prescriptions.  This flaw creates a patient safety risk because the date and time a medication is prescribed or administered or a treatment performed are important pieces of medical information for a practitioner.  This flaw also can distort MU or PQRS reporting since an incorrect date can shift a visit into the wrong MU or PQRS reporting period.

103.    One systemic problem was that when a prescriber in Hawaii prescribed a medication after 6:30pm in Hawaii, the EHR dated it as the next day.  See e.g., Case No. 202150,

opened 4/14/17 ("Hawaii Scripts narcotics after 6pm-e-prescribing, after 6pm Hawaii Time it goes to the next day").

104.     This was a persistent bug in CareCloud's EHR, as were other time zone conversion problems.  For example, see, e.g., Case No. 00111105, opened 12/16/15 ("Patient DOB off by 1 day in SS Demographic pop-up when Time Zone is not EST, Open 547 days); Case No. 00220173, opened 7/18/17 ("Prescription date of medication changed on Signed note"); Case No. 00206432, opened 4/26/17 ("Task date displaying incorrectly").

### 7.  Documents From One Provider Appear in a Different Provider's Records

105.     In October 2017, a CareCloud client reported that documents of an entirely different medical practice appeared in its records.  These two medical practices had no relationship to each other besides both being CareCloud clients.  A patient's driver's license and insurance information appeared in the unrelated practice's records unbeknownst to the patient and his provider.

106.     When Relator asked her supervisor to generate an SQL query to determine if any other client was impacted, CareCloud's Chief Technology Officer (CTO) downplayed the matter and suggested that it only impacted one client (AARA), even though the workflow that created the mishap was advertised to all clients as part of CareCloud's latest code release.

107.     When Relator asked CareCloud's QA Manager to take action to identify all clients that were impacted by this flaw, the QA Manager shrugged her shoulders and advised that the company will deal with complaints as they come in.

108.     As of the date of preparation of this Complaint, Clients have not been notified and no plan has been put in place that Relator is aware of to identify all clients potentially impacted by this problem.

### 8. CareCloud Failed to Satisfy CCDA Requirements

109.    "Consolidated clinical document architecture," or CCDA, is a core data set of the most relevant administrative, demographic, and clinical information facts about a patient's healthcare, covering one or more healthcare encounters.  Various MU Stage 2 criteria require an electronic summary of care document in conformance with established CCDA standards, including (i) 45 CFR § 170.314(b)(1) and (2), Transitions of care; and (ii) 45 CFR § 170.314(e)(2), Clinical Summary.

110.    Based on internal CareCloud communications and Relator's review of service tickets, Relator is informed and believes that Charts had numerous problems preventing it from meeting CCDA standards.  See, e.g., Case No. 0022810, opened 9/7/17 ("Vital Signs not Capturing on Summary CCD"); Case No. 00186924 ("Charts: Unable to edit CCD"); Case No. 00221038, opened 7/24/17 ("Direct Message CCD's cannot be opened in CareCloud"); Case No. 00218269, opened 7/7/17 (same as Case No. 00221038); Case No. 0021063, opened 5/23/17 (same as Case No. 00221038).

### 9. CareCloud Did Not Reliably Record Immunizations/Vaccinations

111.    Meaningful Use Stage 2 requirements mandate provider reporting of immunizations to registries (i.e., state immunization information systems), including reporting of adult vaccination in states where such reporting is allowed.  Relator is informed and believes that CareCloud's EHR did not reliably support this requirement since it had difficulties with immunizations not appearing in patients' charts.  See, e.g., Case No. 00131970, opened 4/1/16 ("Immunization not appearing in the patients Chart"); Case No. 00213575, opened 6/8/17 ("Nothing happens when an immunization task is submitted"); Case No. 00128622, opened 3/16/16 ("Not all dispensed immunizations are appearing in the Immunization widget").

{00076331; 3 }

112.    Relator is further informed and believes that CareCloud's EHR Vaccine Information Statements (VIS) from CDC are only updated manually, even though the VIS should be updated electronically and automatically.  Not only are the VIS not updated electronically in real-time, as they should be, but no one at the company is assigned responsibility for ensuring that what the company manually uploads is the most current version of the VIS.

### 10.  CareCloud's EHR Patient Portal Did Not Operate Reliably

113.    A key aspect of Meaningful Use Stage 2 is to increase the information shared by EPs with patients electronically.  Stage 2 requires that 50 percent of patients must have access to an electronic copy of their health information and 5 percent of patients must have used the capability to access and download their information electronically.  Patient portals help physicians meet this requirement; however, CareCloud's patient portal was unreliable and created problems of its own.

114.    For example, CareCloud's EHR purports to allow patients to exchange secure e-mail with their health care teams via the patient portal; however, the functionality does not work reliably.  For example, one physician reported that patient messages from the portal were not populating her inbox.  The messages bypassed the inbox and went into the patient summary.  Thus, if patient messaged the doctor and reported a concern, the doctor did not see this message.

115.    CareCloud's EHR patient portal experienced many other problems as well.  See, e.g., Case No. 00213495, opened 6/8/17 ("Patient Portal Messages Being Routed to Unassigned Queue"); Case No. 00195007, opened 2/24/17 ("Mass Patient Portal Invites are Not Being Sent/Received"); Case No. 00175597, opened 11/7/16 ("Missing Patient information in Patient Portal"); Case No. 00165479, opened 9/18/16 ("Vanguard Rheumatology Partners: Issues with patient portal messaging").

116.   Recently CareCloud manually sent to providers' inboxes thousands of patient messages from January 2017 to date that had been sitting in the system undelivered. CareCloud did not advise clients that it was doing so, and the clients suddenly saw all of the messages appear with no explanation. After this manual intervention, however, clients once again reported that messages were not coming through from patients. Thus, Relator is informed and believes that the problem of non-delivery of patient messages has not been fixed.

117.   Another problem related to the patient portal concerns how CareCloud calculated compliance with 2014 Modified Stage 2 MU Report Objective 9: Secure Messaging. In 2017, without notice to clients, CareCloud changed the calculation logic in the software once the company realized that its previous logic was not in compliance with federal standards. The previous logic allowed non-clinical messages to count toward this measure, even though federal standards required that only messages between patient and provider should count toward this measure. When CareCloud recognized the problem and changed the logic, so that only messages between patient and provider were counted, many clients failed this measure. CareCloud offered to assist them with an appeal after the fact, but the company did not proactively communicate the change in logic to clients and waited for clients to contact the company.

### 11. CareCloud's EHR System Did Not Contain Adequate Security Protections

118.   There are many bugs and glitches in CareCloud's software that render it vulnerable to breaches of security and other similar abuse. For example, in certain circumstances the EHR system gives users rights to make changes in the system that they should not have. See, e.g., Case No. 229238, opened 9/18/17 (showing that 1,073 users have role as Practice System Administrator and have the capability of giving themselves rights that they are not supposed to

have to patients' records.).   Other clients have experienced an inability to deactivate individual users that are no longer active; these users are still showing as "active."

119.   In other instances, providers are able to change signed encounters to their own name. See e.g., Case No. 00217738 ("Providers are able to change SIGNED encounters by other providers to themselves"); Case No., 00092519, opened 9/18/15 ("System allows providers to sign simple encounters under other provider's name")

120.   Relator is also aware of instances in which non-clinical personnel have been able to order a refill.  See ¶ 94 above.

121.   In addition, CareCloud's audit log did not function reliably.  See, e.g., Case No. 00150632, opened 6/30/16 ("TLCR-Yuma - Charts Audit log not showing user activity"); Case No. 00184845, opened 1/5/17 ("Audit Data Changes report showing incorrect times"); Case No. 00181451, opened 12/14/16 ("Report could not be generated, Audit data changes")

122.   In totality, CareCloud's EHR system does not contain sufficient security protections to ensure against breaches and satisfy Meaningful Use requirements.

**12. CareCloud's Software Did Not Reliably Perform Drug-Drug and Drug Allergy Checks**

123.   To be certified as a Complete EHR under the 2014 Edition certification criteria, an EHR must reliably perform drug-drug and drug-allergy checks in an accurate and safe manner.  In particular scenarios, CareCloud's software did not do this.  See, e.g., Case No. 00077940, opened 7/21/15 ("Allergy for 'measles/mumps/rubella virus vaccine' throws error for 'value too long for type character varying (100)' when saved to chart"); Case No. 00143913, opened 5/31/16 ("Riverview Cardiac Surgery - Missing Allergy".

124.   Based on internal CareCloud communications and Relator's review of development tickets, Relator is informed and believes that Charts did not reliably perform drug-

drug and drug-allergy checks.

### 13. Numerous Other Flaws In CareCloud's Software Render It Noncompliant With Certification Criteria

125. The deficiencies in Charts discussed in this complaint are representative, and are not meant to be exhaustive, of all of the flaws, defects, bugs, and problems that render Charts noncompliant with certification criteria. CareCloud's bug lists, service tickets, development tickets, and complaint lists are replete with reports of problems related to virtually all of the MU criteria, including those not mentioned above. Accordingly, Relator alleges on information and belief that CareCloud's software was unable to meet the majority of ONC standards, implementation specifications, and certification criteria and was unable to perform in a reliable manner consistent with its certification.

### D. CareCloud Utilized an Incorrect Calculation Methodology for MU Measures and PQRS Measures that Caused its Customers to Submit False Information in MU Attestations and PQRS Attestations to CMS

126. In order to qualify for Meaningful Use incentive payments, healthcare providers must not only use certified EHR technology, but must also attest to satisfying certain objectives and measures that correspond and relate to the certification criteria and standards. Likewise, to qualify for upward Medicare payment adjustments or avoid downward payment adjustments under the PQRS program, providers must also attest to meeting the requisite number of PQRS measures.

127. CareCloud provided a software program to assist customers with MU attestations and PQRS reporting. Based on numerous reports of calculation errors for MU and PQRS reporting, Relator is informed and believes that the calculation tool is inaccurate and unreliable, and, as a result, CareCloud caused users unknowingly to submit thousands of claims falsely attesting that they had qualified for federal incentive payments or Medicare payment

adjustments.

### E.   CareCloud Violated the Anti-Kickback Statute

128.   CareCloud paid unlawful remuneration to influential customers to recommend CareCloud's product to prospective customers.  These customers are compensated for their time through invoice credits.  Among other programs, CareCloud employed a site visit program and a reference program. These programs were collectively called the "Champions Program."

129.   Through its site visit program, CareCloud paid current users to host prospective customers at their facility.  The standard rate for an on-site visit was $550 per one-hour visit, with adjustments upward for longer visits.

130.   Through its reference program, CareCloud paid current users to serve as references for prospective customers who wanted to speak with current users about the product.  The standard rate for a reference call was $250 per 60-minute reference call.

131.   In addition, clients that agreed to participate with CareCloud in the creation of a case study based on Client's experience, and/or allow CareCloud to conduct onsite photography for the purposes of such a case study to be published by CareCloud's website were paid $1,500 per case study for up to 6 hours of the client's time.

132.   The above conduct violates the Anti-Kickback statute.  Requests to the Federal Government for incentive payments that resulted from unlawful kickbacks constituted false claims.

## VI.   CLAIMS FOR RELIEF

133.   CareCloud's EHR system did not -- and could not -- meet both the certification criteria and the incentive payment requirements in its operation in the field, and CareCloud concealed the failure from its certification bodies and the Government. CareCloud caused Eligible Professionals falsely to attest to using certified EHR technology and to satisfying Meaningful Use objectives and measures and to submit false information on their attestations requesting incentive payments. CareCloud also knowingly caused customers who participated in the Medicare program to submit false and inaccurate data on PQRS quality measures to CMS, which resulted in the customers receiving upward payment adjustments, or avoiding downward payment adjustments, to which they were not entitled. In addition, CareCloud's violations of the Anti-Kickback statute caused providers to submit false claims for payment to the Government.

134.   Through the conduct discussed above, CareCloud knowingly caused the submission of false claims and false statements material to false claims to be submitted to the Government.

**Count One**
**False Claims Act**
**31 U.S.C. §§ 3729(a)(1)(A), (B), (C), & (G)**

135.   Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 134 above as though fully set forth herein.

136.   This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, et seq., as amended.

137.   By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the United States Government for payment or

{00076331; 3 }

33

approval.

138. By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, false or fraudulent records or statements material to false or fraudulent claims for payment by the Government.

139. By virtue of the acts described above, Defendants knowingly caused its customers to conceal or improperly avoid or decrease an obligation to pay or transmit money or property to the Government;

140. By virtue of the acts described above, Defendants knowingly conspired with others to violate the FCA. Moreover, Defendant took substantial steps toward the completion of the goals of that conspiracy by the conduct alleged herein.

141. Relator cannot at this time identify all of the false claims for payment that were caused by Defendants; conduct. The false claims were presented by several separate entities. Relator does not have access to the records of all such false or fraudulent statements, records or claims.

142. The Government, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

143. By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

144. Additionally, the United States is entitled to the maximum penalty for each and every violation arising from Defendants' unlawful conduct alleged herein.

## PRAYER

WHEREFORE, *qui tam* Plaintiff-Relator Ada de la Vega prays for judgment against the Defendants as follows:

1. That Defendants cease and desist from violating 31 U.S.C. § 3729 *et seq.*

2. That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty for each violation of 31 U.S.C. § 3729;

3. That Relator be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act.

4. That Relator be awarded all costs of this action, including attorneys' fees and expenses; and

5. That Relator recover such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a

trial by jury.

Dated:  October 13, 2017

PHILLIPS & COHEN LLP

*Jeffrey W. Dickstein*

By: _____
Jeffrey W. Dickstein (FL Bar No. 434892)
Phillips & Cohen LLP
Southeast Financial Center
200 S. Biscayne Blvd., Suite 2790
Miami, Florida 33131
Tel: (305) 372-5200
jdickstein@phillipsandcohen.com

Colette G. Matzzie
Phillips & Cohen LLP
2000 Massachusetts Ave. NW
Washington, D.C.  20036
Tel: (202) 833-4567
Fax: (202) 833-1815
cmatzzie@phillipsandcohen.com

Larry P. Zoglin
Phillips & Cohen LLP
100 The Embarcadero, Suite 300
San Francisco, CA 94105
Tel:  (415) 836-9000
Fax:  (415) 836-9001
lzoglin@phillipsandcohen.com

Attorneys for Plaintiff-Relator Ada de la Vega